IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM E. WALLACE,          :
 ET AL.                      :

        v.                   :      Civil Action No. DKC 2008-0251

                             :

PATRICIA H. POULOS, ET AL.
                             :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case brought under 42 U.S.C. § 1983 are (1) a motion for summary judgment filed by Plaintiffs William Wallace and Georgiana Wallace (Paper 56) and (2) a cross-motion for summary judgment filed by Defendants Montgomery County, Maryland, and Officers Patricia Poulos, Shon Barr, and Kevin Burns (Paper 62).  The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the following reasons, both motions will be granted in part and denied in part.

**I.  Background**

The following facts are uncontroverted unless otherwise noted. Plaintiff William Wallace ("Wallace") is the father of five children, including a five-year-old daughter named Georgiana Wallace.  Georgiana is also a named Plaintiff in this case.

Deanne Upson is Georgiana's biological mother.  After a highly contentious custody dispute, Judge Richard Jamborsky of the Circuit Court for the City of Alexandria, Virginia awarded Wallace sole custody of Georgiana, effective December 7, 2006.  On December 26,

2006, Judge Jamborsky denied Upson's renewed request for custody of Georgiana. He subsequently issued a Final Order of Custody on March 1, 2007 awarding sole custody to Wallace and suspending all further visitation from Upson because it was not in the best interest of the child. (Paper 56, Ex. 3, Final Order of Custody, at 4). Upson appealed the decision, which the Court of Appeals of Virginia dismissed in October 2007. (Paper 56, Ex. 4). Georgiana currently lives with her father, stepmother, and brothers and sisters. It is undisputed that Wallace has had sole legal custody of Georgiana at all times relevant to this litigation.

On December 27, 2007, Upson appeared *pro se* in the Superior Court of the District of Columbia to obtain a civil temporary protective order ("TPO") against Wallace. (Paper 56, Ex. 23). In support of her request, Upson alleged that she had an interaction with Wallace the day before where Wallace had taunted her, threatened that she was going to go to jail, and made her feel very intimidated. In addition, Upson led Judge Jose M. Lopez, who presided over the hearing, to believe that she had custody of Georgiana pursuant to a *pendente lite* order from the Superior Court of the District of Columbia, which required that Wallace pay Upson $4000 a month in child support. (*Id.* at 6). However, unbeknownst to Judge Lopez, the Superior Court had terminated the child support order on January 23, 2007 and dismissed the case as beyond the jurisdiction of the court in light of the Final Order of Custody

that had been issued by the Alexandria Circuit Court. (Paper 56, Ex. 31). Upson failed to make any mention of the Final Order of Custody to Judge Lopez.

Judge Lopez granted the *ex parte* order, which required Wallace not to "assault, threaten, stalk, harass or physically abuse [Upson] or *[Georgiana]* or destroy [Upson's] property in any manner." (Paper 56, Ex. 23, at 10) (emphasis added). The court directed that "custody of the minor child shall be left under the provisions of the custody case D.C. Superior Court 2004 PCS 1375." (*Id.*). As previously explained, the Superior Court had held that all claims for custody in this case were beyond the jurisdiction of the court. Therefore, pursuant to the Final Order of Custody, Wallace retained sole legal custody over Georgiana.[1]

Upon securing the TPO, Upson drove to Wallace's residence and called the Montgomery County Police Department. (Paper 66, Ex. 58). Upson told the operator that she had just received a TPO giving her "custody of my baby daughter, Georgiana," and requested that an officer assist her in delivering the TPO to Wallace. The operator informed Upson that a police officer would meet her near Wallace's home.

_____

[1] A day after the TPO was issued, Judge Lopez vacated *ab initio* the TPO noting that Upson had improperly used the TPO to take physical custody of Georgiana from Wallace. (Paper 56, Ex. 25).

Defendants Shon Barr and Patricia Poulos, Montgomery County police officers, were on duty on the day in question.  They heard a call from the police dispatcher explaining that there was a "domestic dispute in progress" and Upson had "an order to pick up her daughter." (Paper 56, Ex. 9).   Poulos and Barr then proceeded to the designated location to meet Upson.  Upson gave Poulos a copy of the TPO, a copy of the *pendente lite* child support order, and a notice of hearing in the District of Columbia in connection with the TPO.  Defendants Poulos and Barr, Poulos' daughter, Upson and Upson's mother proceeded to Wallace's home.[2]

The parties disagree significantly on the events that unfolded thereafter.   According to Plaintiffs, Wallace saw vehicles approaching his home and headed toward the garage door exit to speak to the police outside the presence of Georgiana, who was inside the house.  Plaintiffs contend that Poulos demanded that Wallace surrender custody of Georgiana as was allegedly required by the TPO.  When Wallace refused, Defendant Barr removed his taser from his holster, removed the safety lock, and aimed it directly at Wallace's heart.  (Paper 66, Ex. 67, Wallace Aff. ¶ 85-87). Wallace contends that he again refused to surrender Georgiana because he had sole custody of the child, at which point he was slammed against his vehicle, had his legs kicked out from under

---

[2]   According to Poulos, her daughter accompanied her as a "ride along" and was inside the police vehicle during the events in question.  (Paper 56, Ex. 47, Poulos Dep., at 173-74).

him, and was violently handcuffed.   Wallace further asserts that
when he complained about how tight the handcuffs had been closed,
one or both of the officers twisted the cuffs to inflict further
pain.   Wallace claims that the force of Poulos and Barr's actions
caused his shoulder to be dislocated.   Upon Wallace's arrest,
Poulos took Georgiana from the home and gave her to Upson, who had
been waiting in a vehicle on Wallace's property during the
altercation between Wallace and the officers.

     Defendants present a very different version of the facts.
According to Defendants, Poulos and Barr introduced themselves to
Wallace and informed him that they were there to read and serve him
with a TPO.   Wallace began cursing and screaming almost immediately
after Poulos began reading the TPO, "to the point of looking like
he was going to strike people." (Paper 62, Ex. 5, Poulos Dep., at
296).   Defendant Barr then saw Wallace shove his daughter Georgiana
into the house.   Wallace's aggression caused Poulos to back away
from him, draw her taser, and tell Wallace to calm down.[3]   Fearing
that his partner was about to be physically assaulted, Barr stepped
in behind Wallace and placed him in handcuffs.   Poulos then
entered Wallace's home to retrieve clothing for Georgiana, and
carried Georgiana to the police car.   Poulos states that Wallace

---

     [3]   There is a dispute among the parties as to which officer
directed the taser at Wallace.   Wallace contends that it was
Defendant Barr, while both Barr and Poulos state that it was Poulos
who held the taser at Wallace. (Paper 62, Ex. 5, Poulos Dep., at
301; Ex. 6, Barr Dep., at 354).

never informed her that he had full custody of Georgiana.  (Paper 56, Ex. 47, Poulos Dep., at 334-36).

The remaining facts are uncontroverted.  Wallace was transported and processed at the Montgomery County Detention Center's central processing unit, at which time Defendant Barr prepared a Statement of Probable Cause and Statement of Charges. (Paper 56, Ex. 12).  In the Statement of Probable Cause, Barr wrote that "[a]fter service of the order [TPO], Wallace stated to your Affiant that he would not comply with any order and became verbally hostile to your Affiant and Ofs. Poulos.  Wallace pushed his daughter into the house and shut the door."  (Paper 56, Ex. 12). The Statement of Charges explained that the "[t]he [TPO] awarded temporary custody of Georgiana Upson DOB 5/30/04 to Deanne Upson." It also stated that Wallace had violated Md. Code Ann. Fam. Law § 4-508.1.[4]

---

[4]   Md. Code Ann. Fam. Law § 4-508.1 provides, in pertinent part:

> (c) A law enforcement officer shall arrest with or without a warrant and take into custody a person whom the officer has probable cause to believe is in violation of an order for protection that was issued by a court of another state or a Native American tribe and is in effect at the time of the violation if the person seeking the assistance of the law enforcement officer:
>
> (1) has filed with the District Court or circuit court for the jurisdiction in which the person seeks assistance a copy of the order; or

(continued...)

Later that evening, Wallace was brought before Commissioner Kaitlyn Boyle.  Commissioner Boyle determined that the TPO did not give custody of Georgiana to Upson, and that there was no probable cause for arresting or charging Wallace. (Paper 56, Ex. 52, Boyle Dep., at 36).  She directed that Wallace be released immediately. (*Id.*, Ex. 52, at 43).  Wallace subsequently hired a private investigator, who found Georgiana in an apartment owned by Upson's lawyer.  Wallace retrieved Georgiana and brought her back to his home.  On January 14, 2008, the charges against Wallace were *nolle prossed*.

Plaintiffs filed an eleven count complaint against Poulos, Barr, Sergeant Kevin Burns, as well as Montgomery County on January 28, 2008.[5]  Plaintiffs assert: (1) a 42 U.S.C. § 1983 claim based on violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution against all Defendants, including Montgomery County; (2) violations of Articles 24 and 26 of the Maryland Constitution against all Defendants; (3) false arrest

---

[4](...continued)

> (2) displays or presents to the law enforcement officer a copy of the order that appears valid on its face.

[5]  Sergeant Burns was the shift supervisor on the day that Wallace was arrested, but he was only in touch with the other Defendants by phone from his office. (Paper 62, Ex. 7, Burns Dep., at 33-34, 117, 121).  Plaintiffs have sued Burns because he had supervisory responsibility over Poulos and Barr and authorized their allegedly unlawful conduct.

against the individual Defendants; (4) false imprisonment against the individual Defendants; (5) malicious prosecution and abuse of process against Poulos and Barr; (6) assault against the individual Defendants; (7) battery against the individual Defendants; (8) kidnapping and intentional interference with custodial relationship against the individual Defendants; (9) civil conspiracy against the individual Defendants; (10) negligent training against Montgomery County; and (11) negligent supervision against Montgomery County. Plaintiffs filed a motion for summary judgment purportedly on all counts on September 23, 2008.  (Paper 56).  Defendants filed a cross-motion for summary judgment, again purportedly on all counts, on October 23, 2008.  (Paper 62).

## II.  Standard of Review

It is well-established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th

Cir. 2001).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celetox Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir. 1997), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely

9

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

When faced with cross-motions for summary judgment, as in this case, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003) (internal quotation marks omitted); *see also havePower, LLC v. Gen. Elec. Co.*, 256 F.Supp.2d 402, 406 (D.Md. 2003) (citing 10A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2720 (3d ed. 1983)). The court reviews each motion under the familiar standard for summary judgment, *supra*. The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Federal Practice & Procedure § 2720.

## III.  Analysis

### A.  Count I: Violations of 42 U.S.C. § 1983

Plaintiffs assert that they are entitled to summary judgment on their 42 U.S.C. § 1983 claim based on violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution. First, Plaintiffs contend that Defendants' interference with Wallace's custodial relationship with Georgiana deprived both Wallace and Georgiana of their constitutionally-

10

protected rights under the due process clause of the Fourteenth Amendment.   Second, Plaintiffs insist that Defendants violated their Fourth Amendment rights by entering Wallace's property in the absence of a warrant and without his consent, violently restraining him, unlawfully arresting him, and physically seizing Georgiana. Finally, Plaintiffs maintain that Wallace was arrested for "mouthing off," which violated his freedom of expression under the First Amendment.

Defendants counter that Plaintiffs cannot show that any of their constitutional rights were violated.   In addition, Defendants point out that even if Plaintiffs could make such a showing, Defendants are entitled to summary judgment because qualified immunity shields them from liability.

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.   A plaintiff raising a § 1983 claim must show that a person acting under color of state law deprived him of a constitutional right.   *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 658 (4th Cir. 1998).   It is undisputed that Defendants' actions were under color of state law.

The Supreme Court of the United States recently revised the procedure for determining whether a defendant is entitled to qualified immunity. *Pearson v. Callahan*, 129 S.Ct. 808 (2009). Instead of the rigid two-prong analysis, which was to be "considered in proper sequence" as directed in *Saucier v. Katz*, 533 U.S. 194, 200 (2001), courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. The first prong considers whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. If the evidence establishes a violation of a constitutional right, the second prong is to assess whether the right was "clearly established" at the time of the events at issue. *Id.* If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability. The court should make a ruling on the qualified immunity issue "early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Id.* at 200.

The United States Court of Appeals for the Fourth Circuit set out the proper way to evaluate the separate *Saucier* issues:

> The "answer to both Saucier questions must be
> in the affirmative in order for a plaintiff to

defeat a ... motion for summary judgment on
qualified immunity grounds." *Batten v. Gomez*,
324 F.3d 288, 293-94 (4th Cir. 2003). The
plaintiff bears the burden of proof on the
first question-*i.e.*, whether a constitutional
violation occurred. *Bryant v. Muth*, 994 F.2d
1082, 1086 (4th Cir. 1993) ("Once the
defendant raises a qualified immunity defense,
the plaintiff carries the burden of showing
that the defendant's alleged conduct violated
the law"); *see also Crawford-El v. Britton*,
523 U.S. 574, 589, 118 S.Ct. 1584, 140 L.Ed.2d
759 (1998) (noting that the Court's qualified
immunity holding in Harlow "related only to
the scope of an affirmative defense" and did
not change "the plaintiff's burden of proving
a constitutional violation"); *Carr v. Deeds*,
453 F.3d 593, 608 (4th Cir. 2006) (affirming
summary judgment in qualified immunity appeal
"because the plaintiff failed to bring forth
admissible evidence from which the jury could
conclude" that the officer used excessive
force); *Figg v. Schroeder*, 312 F.3d 625, 642
(4th Cir. 2002) (noting that a § 1983
plaintiff "must prove the illegality of the
seizure"). The defendant bears the burden of
proof on the second question- *i.e.*,
entitlement to qualified immunity. *Wilson v.
Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003)("The
burden of proof and persuasion with respect to
a claim of qualified immunity is on the
defendant official."); *see also Bailey v.
Kennedy*, 349 F.3d 731, 739 (4th Cir.2003)
(same); *Tanner v. Hardy*, 764 F.2d 1024, 1027
(4th Cir. 1985) ("It is a well established
principle that qualified immunity ... is a
matter on which the burden of proof is
allocated to the defendants."); *Logan v.
Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981)
("the good faith immunity of individual police
officers is an affirmative defense to be
proved by the defendant"); *cf. Dennis v.
Sparks*, 449 U.S. 24, 29, 101 S.Ct. 183, 66
L.Ed.2d 185 (1980)(noting that in a § 1983
action "the burden is on the official claiming
immunity to demonstrate his entitlement"); *but
cf. Harlow*, 457 U.S. at 815 n. 24, 102 S.Ct.
2727 (explaining that the Court had not

decided which party bears the burden of proof).

*Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007)(footnotes omitted).

As to the second question:

Although the exact conduct at issue need not have been held unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992) (explaining that "[t]he fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was nevertheless 'clearly established' for qualified immunity purposes" and that "'[c]learly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked"). A determination that a right is clearly established may be based on controlling authority in the jurisdiction in question or on a "consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

*Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005). The sources of law to examine on the second question are limited:

Clearly established rights include specifically adjudicated rights as well as those manifestly included within more general applications of the core constitutional principles involved. *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998). There are three ways in which law becomes clearly established in

> Maryland: (1) an authoritative decision by the
> United States Supreme Court; (2) an
> authoritative decision by the Fourth Circuit
> Court of Appeals; or (3) an authoritative
> decision by the Court of Appeals of Maryland.
> *Id.* Decisions from other circuits or states
> are not authoritative for qualified immunity
> analysis. *Id.*

*Gray v. Torres*, 2009 WL 2169044, *2 (D.Md. 2009).

## 1.  Fourteenth Amendment Violations

The Fourteenth Amendment provides that no state "shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV.   The due process clause of the Fourteenth Amendment "guarantees more than fair process" and "includes a substantive component that provides heightened protection against government interference with certain fundamental rights." *Martin v. St. Mary's Dep't of Social Servs.*, 346 F.3d 502, 511 (4th Cir. 2003).   The core of substantive due process is to protect the individual against "arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).   "[T]he interest of parents in the care, custody, and control of their children" has been described as "perhaps the oldest fundamental liberty interests recognized" by the Supreme Court.   *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

Plaintiffs argue that they are entitled to summary judgment on their § 1983 claim because Defendants' unlawful seizure of Georgiana violated their rights to "familial integrity" under the

Fourteenth Amendment.  Defendants counter that Plaintiffs' alleged right to familial integrity is neither absolute nor unqualified, and can be outweighed by legitimate government interests. Defendants argue that this case is analogous to *Martin,* 346 F.3d. at 502.  In *Martin*, a mother brought a § 1983 action against the county department of social services and two social workers after her children were forcibly removed from her home without a court order.  Social services officials had filed a Child in Need of Assistance ("CINA") petition in response to a complaint that one of the plaintiff's sons had stayed home for half of the school year. A circuit court awarded social services care and custody of the child, but permitted both boys to remain in their mother's physical custody pending a full adjudicatory hearing.  Prior to the hearing, the plaintiff and her children moved from Maryland to Los Angeles, California.  The Los Angeles Department of Child Services subsequently went to the plaintiff's home and forcibly removed the children over the objections of the plaintiff.  The plaintiff filed suit in the district court, which held that the defendants were entitled to qualified immunity.  On appeal, the plaintiff argued that her rights to familial integrity and due process of law were sufficiently clear to enable the defendants to know that the children should not have been removed from her custody absent a court order.  The Fourth Circuit disagreed, finding that the right to familial integrity was "amorphous" and that the contours of the

16

right may not be sufficiently clear in certain situations.  *Id.* at
506.  Even assuming that the right to familial integrity was
clearly established, the court reasoned that the facts did not show
that the defendants committed any intentional wrongdoing.  The
court also pointed out that the availability of a post-deprivation
hearing and the return of the children within twenty-four hours
demonstrated that there was no due process violation.

Plaintiffs insist that Defendants' reliance on *Martin* is
misplaced.  First, Plaintiffs point out that *Martin* did not involve
a lawsuit against police officers, as is the case here.  Second,
*Martin* involved allegations of child neglect and abuse, neither of
which are present here.  Plaintiffs further point out that the
holding in *Martin* was limited to those circumstances where a child
is in immediate danger.  Plaintiffs insists that the holding in
*Martin* has no application here because Defendants do not assert
that Georgiana was in any immediate danger.

Plaintiffs argue that Defendants completely ignore a Fourth
Circuit decision that they claim is on all fours with this case,
*Batten v. Gomez*, 324 F.3d 288 (4th Cir. 2003).  In *Batten*, the
plaintiff and her child, who were staying in California, fled to
North Carolina after the child's biological father allegedly beat
and threatened the mother on several occasions.  The father
promptly filed charges of civil abduction against the plaintiff and
instituted civil proceedings to enforce his rights as a parent

17

under California law.  A municipal court subsequently issued a
felony warrant for the mother's arrest for child abduction.  The
North Carolina sheriff's department tracked down the mother in
North Carolina and informed her that they had an order to pick up
her child and a warrant to arrest her for child abduction.  The
mother went back to California and, after a custody hearing, was
awarded full custody of her daughter.  The plaintiff then filed
suit, arguing that the seizure of her child had deprived her of a
liberty interest under the due process clause of the Fourteenth
Amendment.  The court agreed, finding that due process "requires
pre-enforcement notice and some opportunity to object before law
enforcement officials may separate a parent from her child pursuant
to an out-of-state order."  *Id.* at 295 (quoting *Morell v. Mock*, 270
F.3d 1090, 1097-00 (7th Cir. 2001)).  The court also pointed out
that there were no exigent circumstances that justified the seizure
of the child without notice and a hearing.  Thus, the court
determined that the defendant had violated the plaintiff's
Fourteenth Amendment right to due process.  *Batten*, however, is not
identical to the circumstances in this case.  It involved the
enforcement of a custody order, not an order for protection.

Judge Lopez's order was a protective order.  A protective
order serves a different function than a custody order.  Under
District of Columbia law, a temporary protection order may only be
issued if the court finds that the safety or welfare of a family

18

member is immediately in danger by the respondent.  D.C. Code §
16-1004 (2001), which governs temporary protective orders in the
District of Columbia, provides in pertinent part:

> (a) Upon a filing of a petition for civil
> protection, the Domestic Violence Unit shall
> set the matter for hearing, consolidating it,
> where appropriate, with other matters before
> the court involving members of the same
> family.
>
> (3) *If a respondent fails to appear for a
> hearing on a petition for civil protection
> after having been served* in accordance with
> the Rules of the Superior Court of the
> District of Columbia, and a civil protection
> order is entered in accordance with § 16-1005,
> the temporary protection order shall remain in
> effect until the respondent is served with the
> civil protection order or the civil protection
> order expires, whichever occurs first.

(emphasis added).  This language suggests that a hearing is held
only *after* the temporary protective order is served.[6]

     The cases discussed above demonstrate that Plaintiffs' motion
for summary judgment on this claim must fail.  They have not
established as a matter of law that their Fourteenth Amendment
rights have been violated.  On the other hand, Defendants are
entitled to summary judgment as to the damage claim because they
have shown that the law was not clearly established as of the time

_____

     [6] A hearing was set for January 10, 2008. Paper 56, Ex. 26.

they acted.  Given the uncertainty of the law, Defendants were not given "fair warning that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006).

## 2.  Fourth Amendment Violations

Plaintiffs also contend that they are entitled to summary judgment on their § 1983 claim based on Fourth Amendment violations.  Specifically, Plaintiffs assert that Defendants violated Wallace's right to be free from an unreasonable search and seizure by coming on Wallace's property and entering his garage without a warrant or consent, entering Wallace's residence without a warrant or consent, pointing an armed taser at close range directly at Wallace's heart, violently handcuffing Wallace, arresting and jailing Wallace, and physically seizing Georgiana.

Defendants counter that they are entitled to summary judgment on Plaintiffs' Fourth Amendment claim.  Defendants argue that Wallace's Fourth Amendment rights were not violated because they had a legal right to enter Wallace's property and serve him with the TPO.  In addition, they argue that they acted reasonably in directing the taser at Wallace, that Wallace's arrest was supported by probable cause, and that they used reasonable force in arresting Wallace.

The Fourth Amendment provides, in pertinent part, "[t]he right of the people to be secure in their persons [and] houses . . .

20

against unreasonable searches and seizures, shall not be violated
. . . ."  U.S. Const. Amend. IV.  The first step in a Fourth
Amendment analysis is to identify the search or seizure at issue.
*United States v. McCoy*, 513 F.3d 405, 411 (4th Cir. 2008).  A Fourth
Amendment seizure occurs "when there is a governmental termination
of freedom of movement through means intentionally applied."
*Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

   **a.  Defendants' Initial Entry on to Wallace's Property**

   Plaintiffs assert that Poulos and Barr had no legal authority
to enter any portion of Wallace's property without a warrant,
including the outskirts of the property.  Plaintiffs insist that
Defendants were not ordered to serve the TPO issued by the Superior
Court of the District of Columbia, and that there is no authority
that directs or even authorizes the Montgomery County police to go
onto private property to serve an out-of-state civil process.
Plaintiffs also point out that Defendants disregarded the "no
trespassing" sign posted in front of the home, and that in doing
so, Defendants committed a criminal trespass.  Defendants insist
that they had the right to enter Wallace's property to serve the
TPO.

   Pursuant to Montgomery County Police Department policy, police
officers may both serve and enforce out-of-state protective orders.
Montgomery County Police Department Domestic Violence Order Number
535 states that "[a]lthough the Sheriff's Department bears the

primary responsibility for the service of said orders, the sometimes volatile nature of domestic disputes will frequently require police officers to both serve and enforce these orders." (Paper 56, Ex. 44, Domestic Violence FC No: 535, at 3). Sergeant Michael Stull, who works in the Domestic Violence Unit of the Sheriff's Office, confirms that although the Sheriff's Department has primary responsibility for serving protective orders, Montgomery County police officers have the authority to serve them as well. (Paper 56, Ex. 52, Stull Dep., at 17). In addition, Poulos states that she had been informed that the Sheriff's Office was not available and that Poulos could serve the order to Wallace instead. (Paper 56, Ex. 47, Poulos Dep., at 219-20).

Moreover, Plaintiffs' contention that Defendants are liable for criminal trespass is fatal to their § 1983 claim. It is undisputed that § 1983 protects only individuals who allege a deprivation of a *federal* constitutional right. *Dowe*, 145 F.3d at 658. A § 1983 action "is not predicated on the legality or illegality of an act under state law." *Clipper v. Takoma Park*, 876 F.2d 17, 19 (4th Cir. 1989), *rehearing denied en banc*, 898 F.2d 18 (4th Cir. 1989); *Clark v. Link*, 855 F.2d 156, 161-63 (4th Cir. 1988). Trespass is a state law claim, and is thus not actionable under § 1983. Therefore, Defendants' motion for summary judgment will be granted on the aspect of the Fourth Amendment claim based on entry onto the property.

**b. Defendants' Entry into Wallace's Garage and Home**

Plaintiffs also maintain that Defendants violated their reasonable expectation of privacy under the Fourth Amendment by entering the garage to speak with Wallace notwithstanding that Wallace did not give his consent to their entry. Wallace contends that Defendants further violated his Fourth Amendment rights when they entered his home to retrieve Georgiana and her clothing. Defendants insist that they are entitled to summary judgment on this claim because Wallace impliedly consented to their presence in the garage given that he never asked them to leave and continued to speak with them in the garage. Defendants do not address the reasonableness of their entry into Wallace's home.

"The Fourth Amendment, while concerned with official invasions of privacy through searches and seizures, is eloquent testimony of the sanctity of private premises." *Lombard v. State of La.*, 373 U.S. 267, 274 (1963) (Douglas, J., concurring). Thus, when the police enter private dwellings they must, with rare exceptions, come armed with a warrant. *Id*. "The principle that a man's home is his castle is basic to our system of jurisprudence." *Id*. at 275. Indeed, "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980). The curtilage of the home is entitled to the same level of Fourth Amendment protection that is extended to the home. *Rogers v. Pendleton*, 249 F.3d 279,

287 (4th Cir. 2001).   The curtilage is "determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself."   *Id*.   Courts consider "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."   *United States v. Breza*, 308 F.3d 430, 435 (4th Cir. 2002); compare *United States v. Pyne*, 175 Fed.Appx. 639 (4th Cir. 2006) (unpublished) (holding that parking garage was not part of the defendant's curtilage where the garage was used by other tenants, had multiple parking spaces, and was located at the bottom level of an apartment complex); *United States v. Cruz Pagan*, 537 F.2d 554, 558 (1st Cir. 1976) (holding that entry into a condominium parking garage did not violate the Fourth Amendment because there is no reasonable expectation of privacy in a garage used by several people).

Here, Wallace's garage was directly adjacent to his home.   It was solely used by Wallace and other members of his family, and was not open or accessible to the public.   Wallace's garage is within the curtilage of his home, and is therefore subject to Fourth Amendment protection.

The next issue is whether Officers Poulos and Barr violated Wallace's Fourth Amendment rights by entering the garage.   Here,

there are genuine issues of material fact that preclude summary judgment for both parties.  Wallace states that Poulos and Barr "aggressively" entered his garage and refused to leave after he ordered them to do so.  (Paper 56, Attach. 2, Wallace Aff. ¶¶ 50-53).  Poulos, in contrast, states that Wallace never told her that he did not want her or Barr in his garage.  (Paper 56, Ex. 47, Poulos Dep., at 199-200).  The question of whether the TPO authorized entry into the garage is also not answered on the current record.

With respect to the entry of the home itself, entry in the absence of a warrant or exigent circumstances may well have violated Plaintiffs' reasonable expectation of privacy.  It is undisputed that Poulos entered Wallace's home to retrieve Georgiana as well as her clothing.  (Paper 56, Ex. 12, Statement of Probable Cause).  In their opposition, Defendants do not even attempt to argue that their entry into the home was reasonable under the circumstances.

Thus, the entire question of whether the entry into the garage and/or the home violated Plaintiffs' Fourth Amendment rights remains in issue and neither side is entitled to summary judgment.

**c.  Pointing the Taser at Wallace**

Plaintiffs insist that there was no justification for Barr to point his taser at Wallace because he was not resisting arrest and there was the potential of serious injury.  Plaintiffs contend that

Defendants' actions amounted to excessive force.   Defendants counter that their actions were reasonable under the circumstances. According to Defendants, it was reasonable to point the taser at Wallace because he yelled and screamed at Poulos, gritted his teeth, and put his fist into a "ball" as if to strike Poulos. (Paper 62, Ex. 5, Poulos Dep., at 300-02; Ex. 6, Barr Dep., at 354).   Barr stated that Wallace came "off the stoop at Officer Poulos in a manner very consistent with someone who was about to commit an assault.").   (*Id.*, Ex. 6, at 396).   Defendants also point out that the taser was pointed at Wallace, but never used.

"[A]ll claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen, should be analyzed under the Fourth Amendment and its 'reasonableness' standard."   *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786-87 (1998).   Here, it is undisputed that Poulos did not use the taser, but only directed it at Wallace.   Plaintiffs insist, however, that pointing a dangerous weapon at an unarmed suspect can trigger a Fourth Amendment violation, and cite a few cases from other circuits.   *See, e.g., Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002) (pointing a drawn gun at the head of an apparently unarmed man suspected of shooting his neighbor's dogs was actionable as excessive force); *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992)

(pointing a gun at a nine year old's head and threatening to pull the trigger constitutes excessive force). These cases are not analogous because here, Defendants reasonably believed that Wallace was going to commit an assault. Wallace does not refute Plaintiffs' contention that he yelled and screamed at the officers and appeared extremely agitated. Additionally, both Poulos and Barr stated that Wallace looked as though he was going to strike Poulos. In contrast, in *Robinson* and *McDonald*, it was undisputed that the plaintiffs posed no threat to the officers. In viewing the circumstances from the perspective of a reasonable officer, the pointing of a taser at Wallace did not constitute excessive force under the Fourth Amendment. Therefore, Defendants' motion for summary judgment on this claim will be granted, and Plaintiffs' denied.

### d. Seizure and Arrest of Wallace

Wallace insists that he is entitled to summary judgment on his Fourth Amendment claim because Defendants had no probable cause to arrest him given that he had not violated any aspect of the TPO. Defendants insist that they had probable cause to arrest Wallace because he came toward them in a threatening manner while they were attempting to effect service of the TPO. Additionally, they maintain that they reasonably believed that he was violating the TPO by having contact with his daughter.

27

"Probable cause requires more than bare suspicion but requires less than evidence necessary to convict." *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998).   Probable cause is based on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.   *United States v. Foreman*,   369 F.3d 776, 781 (4th Cir. 2006) (citing *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996)).   "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."   *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).   A court will examine the events leading up to the arrest, and then decide whether these facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Here, there is a key issue of material fact that precludes granting summary judgment for either party.   Namely, Wallace states that he repeatedly told Poulos and Barr that he had legal custody of Georgiana and offered to show them a copy of the Final Order of Custody, which Defendants allegedly refused to see.   In contrast, Poulos states that Wallace never informed her that he had legal custody of Georgiana.   Accordingly, she believed that Wallace was violating the TPO by having contact with his daughter.   In light of the dispute in fact, both motions for summary judgment will be denied on this claim.

### e.  Seizure of Georgiana

Finally, Plaintiffs assert that their Fourth Amendment rights were violated when the police seized Georgiana from Wallace's home. Plaintiffs argue that the police could have placed Georgiana in the custody of Wallace's wife or his nineteen-year-old daughter, particularly given that his older daughter was at the property when Wallace was arrested.  Wallace asserts that as Georgiana's legal custodian, he had the right to decide who should take temporary custody of Georgiana.  Defendants do not address Plaintiffs' assertion in their opposition.

The officers' actions of taking Georgiana away from her father constituted a seizure because it restricted the child's freedom of movement, and thus triggered a Fourth Amendment violation.  As explained in the context of Plaintiffs' Fourteenth Amendment claim, however, Defendants are entitled to qualified immunity concerning their actions based on the TPO.  The law was not clearly established at the time of these events as to whether this type of order permitted the police to seize the child.

### 3.  First Amendment Violations

Plaintiffs further argue they are entitled to summary judgment on their § 1983 claim based on Defendants' infringement of Wallace's right to expression under the First Amendment. Specifically, Plaintiffs assert that Wallace was arrested for "mouthing off" to the police.  Wallace contends that after he was

handcuffed, he complained that he was in excruciating pain.  One of the Defendants then allegedly twisted the handcuffs, and Poulos advised him that "he should have thought about [the pain] before mouthing off about suing" her. (Paper 56, Attach. 2, Wallace Aff. ¶ 92).  Defendants insist that Wallace was arrested because he failed to comply with the TPO and for no other reason, and this is what is stated in the Statement of Probable Cause.  Defendants also deny that they handcuffed Wallace in such a way that would cause severe pain.

"The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987).  The "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Id.* at 461.  Wallace had a constitutional right to protest to the officers about his arrest as well as the seizure of his child.  Moreover, there is a genuine issue of material fact as to whether Defendants twisted the handcuffs on Wallace as a means of punishing him for "mouthing off."  Therefore, both motions for summary judgment on this claim will be denied.

**4.  § 1983 Claims Against Montgomery County**

Plaintiffs assert that they are entitled to summary judgment on their § 1983 claim against Montgomery County because their

injuries stem from the County's demonstrated custom, practice or policy of condoning the unlawful conduct of the defendants Poulos, Barr and Burns by not taking any corrective action after learning of the conduct and by being openly indifferent.   Plaintiffs also contend that the County has a practice of failing to reprimand errant police officers and failing to provide remedial training to those whose conduct is not in accord with County policy. Defendants insist that they are entitled to summary judgment because none of Plaintiffs' contentions have any merit.

A local governmental entity like Montgomery County has no *respondeat superior* liability under § 1983.   *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978); *DiPino v. Davis,* 354 Md. 18, 44 (1999).   However, a local government entity can be held liable under § 1983 where it is itself the wrongdoer. *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 122 (1992). Specifically, to hold a municipality liable under § 1983, it must be shown that the "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.   Local governments can also be sued for constitutional violations pursuant to a custom, even where the custom has not been formally approved through "the body's official decisionmaking channels." *Id.* at 691.

Here, Plaintiffs do not argue that the County has an official policy or informal practice of seizing children from their custodial parents. Plaintiffs maintain only that County officers violated their constitutional rights in one particular incident. It is well-established that a single incident of unconstitutional activity is generally insufficient to prove the existence of a municipal custom or policy. *Semple v. City of Moundsville*, 195 F.3d 708 (4th Cir. 1999); *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000) ("Isolated, unprecedented incidents [] are insufficient to create municipal liability under [§ 1983]"). Moreover, it is undisputed that the County has an established policy to guide officers who are confronted with child custody issues. (Paper 62, Ex. 15). The County has also established an Internal Affairs Division that investigates complaints of excessive force. (Paper 62, Ex. 13). Plaintiffs have failed to present sufficient evidence that the County has a policy or custom of condoning the unlawful conduct of its officers. Therefore, Defendants' motion for summary judgment will be granted on Plaintiffs' § 1983 claim against Montgomery County.

**5.   § 1983 Claims Against Defendant Burns**

Defendants insist that they are entitled to summary judgment on Plaintiffs' § 1983 claim against Sergeant Burns because he was not at Wallace's home on the evening in question and did not personally participate in the alleged constitutional deprivations.

32

Plaintiffs counter that Burns can be held liable because he had supervisory authority over Barr and Poulos and sanctioned their unlawful conduct.

To establish supervisory liability under § 1983, Plaintiffs must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaging in conduct that posed a "pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices ; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4ᵗʰ Cir. 1994), *cert. denied*, 513 U.S. 813 (1994).

Under the first element, a pervasive and unreasonable risk of harm requires evidence that conduct is "widespread, or at least has been used on several different occasions." *Id*. As previously explained, Plaintiffs have not presented evidence or even alleged that the incident giving rise to this action was anything other than an isolated occurrence. Therefore, Plaintiffs fail to establish the first element. Plaintiffs cannot establish the second element either because "deliberate indifference" requires more than evidence of single or isolated incidents. *Slakan v. Porter*, 737 F.2d 368, 373 (4ᵗʰ Cir. 1984), *cert. denied*, 470 U.S.

1035 (1985).  A supervisor cannot be reasonably expected "to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Shaw*, 13 F.3d at 799.

Finally, with respect to the third element, Plaintiffs must demonstrate an affirmative causal link between the supervisor's inaction and the harm suffered by Plaintiffs.  Here, it is likely that Plaintiffs can establish this element because Poulos stated that she called Burns to advise him about what had happened at the Wallace home, and that Burns had authorized the arrest.  (Paper 56, Ex. 47, Poulos Dep., at 314-16).  Nevertheless, Plaintiffs' § 1983 claim against Burns fails because Plaintiffs have not established the first and second elements necessary for supervisory liability. Therefore, Defendants' motion for summary judgment will be granted on the § 1983 claim against Defendant Burns.

## B.  Count II: Violations of Articles 24 and 26 of the Maryland Declaration of Rights

Plaintiffs contend that Poulos, Barr, and Burns violated their state constitutional rights under Articles 24 and 26 of the Maryland Constitution.  Article 24 protects due process rights and Article 26 protects the right to be free from unreasonable searches and seizures.  *See Canaj, Inc. v. Baker & Div. Phase III*, 391 Md. 374, 424 (2006); *see also Carter v. State*, 367 Md. 447, 458 (2002).

These articles are to be construed in *pari materia* with the Fourteenth and Fourth Amendments to the United States Constitution, respectively. *Canaj, Inc.*, 391 Md. at 424.

As previously discussed, Defendants' entry into Plaintiffs' garage and home in the absence of a warrant and exigent circumstances may have violated their Fourth Amendment rights. Therefore, at least one of Defendants' actions may have violated Plaintiffs' rights under Article 26. As for Plaintiffs' Article 24 claim, for which qualified immunity is not a defense, *Okwa v. Harper*, 360 Md. 161, 201 (2000), there is a genuine issue of material fact as to whether Defendants violated Plaintiffs' due process rights by taking Georgiana without providing prior notice. Therefore, both motions for summary judgment will be denied on the Maryland Declaration of Rights claims.

**C.  Counts III and IV: False Arrest and False Imprisonment**

In their complaint, Plaintiffs allege that Defendants Poulos, Barr, and Burns are liable for false arrest and imprisonment because they deprived Plaintiffs of their liberty without consent and legal justification.  Plaintiffs further allege that Defendants failed to conduct an adequate investigation to determine if a crime likely had been committed and that Defendants lacked probable cause to arrest Wallace.  Defendants counter that they cannot be liable for false arrest or false imprisonment because they had probable

cause to arrest Wallace based on his refusal to comply with the TPO.

"The elements of false arrest and false imprisonment are identical." *Heron v. Strader*, 361 Md. 258, 264 (2000). Plaintiffs must show: (1) the deprivation of the liberty of another; (2) without consent; and (3) without legal justification. "[T]he test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest." *Montgomery Ward v. Wilson*, 339 Md. 701, 721 (1995) (quoting *Ashton v. Brown*, 339 Md. 70, 120 (1995)). Therefore, "where the basis of a false imprisonment action is an arrest by a police officer, the liability of the police officer for false imprisonment will ordinarily depend upon whether or not the officer acted within his legal authority to arrest." *Heron*, 361 Md. at 264-65 (quoting *Montgomery Ward*, 339 Md. at 721).

Plaintiffs explain the law of false arrest in their motion but wholly fail to apply the law to the facts at hand. (Paper 56, at 47). Thus, it is not possible to address the issue from their perspective. Defendants argue in their cross-motion only that the arrest was supported by probable cause. Based on the factual discussion above, there is a genuine issue of material fact as to whether Defendants had probable cause to arrest Wallace. Therefore, both motions for summary judgment on this claim will be denied.

### D.  Count V: Malicious Prosecution and Abuse of Process

Plaintiffs label this count "Malicious prosecution and abuse of process."  It seems, however, that they do not assert a claim for abuse of process under Maryland law.  Abuse of process occurs "when a party has wil[l]fully misused criminal or civil process after it has issued [an] order to obtain a result not contemplated by law." *Thomas v. Gladstone*, 386 Md. 693, 701 (2005).  The legitimacy of the action brought against the plaintiff is not an element of this common law tort. *Walker v. Am. Sec. & Trust Co. of Wash., D.C.*, 237 Md. 80, 87 (1964) (stating that abuse of process, unlike the tort of malicious prosecution, is concerned with the improper use of criminal or civil process in a manner not contemplated by law after it has been issued, without the necessity of showing lack of probable cause).

Here, Plaintiffs contend that Defendants Poulos and Barr are liable for malicious prosecution because they lacked probable cause to arrest Wallace, and that their actions were committed with malice.  To establish a malicious prosecution claim, Plaintiffs must show that: (1) Defendants instituted criminal proceedings against Wallace; (2) the criminal proceeding was resolved in Wallace's favor; (3) Defendants did not have probable cause to institute the proceeding; and (4) Defendants acted with malice or a primary purpose other than bringing Wallace to justice. *Okwa v. Harper*, 360 Md. 161, 183 (2000).  Maryland has long recognized that

37

"suits for malicious prosecution are viewed with disfavor in law and are to be carefully guarded against." *One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29, 37 (1997) (citing *N. Point Constr. Co. v. Sagner*, 185 Md. 200, 206 (1945)).  This is because "public policy requires that citizens be free to resort to the courts to resolve grievances without fear that their opponent will retaliate with a malicious use of process lawsuit against them."  *Id.*

First, Plaintiffs argue that the fact that Poulos and Burns did not personally sign the Statement of Charges does not mean that they did not institute criminal proceedings against Wallace. Plaintiffs point out that Defendants did in fact institute criminal proceedings against Wallace by virtue of arresting him.  For purposes of malicious prosecution claims, "[w]here a party instigates, aides or assist[s] in a criminal prosecution he/she may be liable even where he/she did not swear out a warrant." *Smithfield Packing Co. v. Evely*, 169 Md. App. 578, 593 (2006).  By arresting Wallace, Defendants helped assist in the criminal prosecution against him.  Therefore, Plaintiffs satisfy the first element.

Second, it is undisputed that the state criminal proceeding against Wallace was *nolle prossed* on January 14, 2007.  Third, as previously discussed, there is a genuine issue of material fact as to whether Poulos and Barr had probable cause to arrest Wallace. As for the final element, Plaintiffs must show that Poulos and Barr

38

initiated legal proceedings against him with an improper purpose or motive. *Montgomery Ward*, 339 Md. at 719. "Mere negligence in instituting unjustified criminal proceedings against the plaintiff cannot satisfy the 'malice' element." *Id.* Any motive other "that of instituting the prosecution for the purpose of bringing the party to justice" constitutes a malicious motive. *Id.* at 718. Proof of malice "does not require evidence of spite, hatred, personal enmity or a desire for revenge." *Id.* at 719. Here, Plaintiffs argue that malice can be inferred in instances where there is a lack of probable cause to arrest or charge a defendant. However, as previously explained, there is a genuine issue of material fact as to whether Defendants had probable cause to arrest Wallace. Therefore, both motions for summary judgment on the malicious prosecution claim will be denied.

### E. Counts VI and VII: Assault and Battery

Plaintiffs allege in their complaint that Defendants committed an assault when Barr threatened Wallace with a taser pointed directly at Wallace's heart. Plaintiffs further allege that Defendants committed a battery when they came into "offensive contact" with both Wallace and Georgiana. Defendants counter that they cannot be held liable for assault or battery because they had probable cause to arrest Wallace and the force they used was not excessive.

39

A battery is an "an offensive, non-consensual touching-the 'unlawful application of force to the person of another.'" *Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 131 (2001). An assault has been defined as either: (1) an attempt to commit a battery, which is "the unlawful application of force to the person of another;" or (2) "an intentional placing of another in apprehension of receiving an immediate battery." *Caine v. State*, 386 Md. 320, 338 n.11 (2005).

Plaintiffs identify the relevant law in their motion but once again, do not apply the law to the facts. Thus, Plaintiff's motion for summary judgment on Wallace's assault claim will be denied. As for Defendants' cross-motion, the facts must be viewed in light most favorable to Plaintiffs. According to Plaintiffs, Wallace felt extremely nervous and anxious when the taser was pointed at him at close range. (Paper 66, Ex. 67, Wallace Aff. ¶ 86). Poulos concedes that she pointed the taser at Wallace. Poulos' act was intentional and likely placed Wallace in apprehension of receiving an immediate battery. Therefore, Defendants' motion for summary judgment will be denied on Wallace's assault claim.

With respect to the claim of battery, Plaintiffs do not bother to apply the facts of their claim to the applicable law. Therefore, Plaintiffs' motion for summary judgment on the battery claim will be denied. Defendants are also not entitled to summary judgment on the battery claim. Plaintiffs allege in their complaint that

40

Wallace had his legs kicked out from under him, that he was violently handcuffed, and that either Barr or Poulos maliciously twisted his handcuffs even tighter in order to inflict more pain on Wallace.  These incidents constitute an offensive contact.

> **F.   Count VIII: Kidnapping and Intentional Interference with Custodial Relationship**

Plaintiffs allege in their complaint that Defendants intentionally interfered with Wallace's custodial relationship with Georgiana by removing her from Wallace's home, which was in direct violation of a controlling custody decree from the Commonwealth of Virginia.   Defendants counter that any alleged custodial interference was relatively minor, particularly in light of the fact that Georgiana was returned to Wallace within twenty-four hours of being removed from her home.  (Neither side discusses this tort in the context of a police officer acting purportedly pursuant to a court order.)

Liability for custodial interference will be imposed on "[one] who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody, or not to return to the parent after it has been left him." *Hixon v. Buchberger*, 306 Md. 72, 78 (1986) (quoting Restatement (Second) of Torts (1977)).  To prevail on this claim, the parent must have the legal right to custody of the child.  *Id*.

Here, Plaintiffs again merely recite the law in their motion but do not apply the law to the facts, thereby precluding a grant

41

of summary judgment.    (Paper 56, at 48).   Defendants' motion for summary judgment will also be denied.   At the time of the incident, Poulos and Barr knew that Wallace did not consent to the taking of Georgiana as evidenced by Wallace's refusal to comply with the protective order and to provide them with Georgiana's clothing and shoes.    Additionally, it is undisputed that Wallace had legal custody of Georgiana pursuant to the Final Order of Custody issued by the Circuit Court for the City of Alexandria.

Defendants insist that any alleged interference with Wallace's custodial relationship with Georgiana was relatively minor, and rely on *Hixon*, 306 Md. 72, in support of their argument.   Defendants' reliance on this case is misplaced.   In *Hixon*, the plaintiff was the biological father of a child born out of wedlock.   The child lived with his mother as well as the mother's fiancé.   One day, in the presence of the child, the mother's fiancé expressed that the plaintiff was not the child's father and then flatly refused to surrender the child to the plaintiff.   The court determined that the fiance's "belligerent words" resulted in only minor harm, and thus could not constitute a tortious interference with the plaintiff's custodial rights.

Here, Defendants took Georgiana away from Wallace, her custodial parent.   She was not returned to Wallace until the next day.    Defendants' actions are significantly more invasive on Wallace's custodial rights than the utterance of hostile or

42

belligerent words, as in *Hixon*.   Therefore, Defendants' motion for summary judgment on the custodial interference claim will be denied.

### G. Count IX: Civil Conspiracy

Plaintiffs contend that Defendants Poulos, Barr, and Burns "voluntarily combined with each other" as well as with Upson to commit numerous torts in furtherance of a conspiracy.[7]  Defendants counter that their version of the events undercuts Plaintiffs' claim that they came to Wallace's home to engage in an unlawful purpose. Defendants insist that they reasonably believed that they were protecting Georgiana from Wallace pursuant to the TPO.

Under Maryland law, "[a] civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Green v. Wash. Suburban Sanitary Comm'n*, 259 Md. 206, 221 (1970)(internal citation omitted).   Notably, conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff. *Biggs v. Eaglewood Mortg., LLC,* 582 F.Supp.2d 707, 717 (D.Md. 2008). Therefore, a defendant can only be liable for civil conspiracy if he is also liable for a separate, substantive tort. *Alleco v. Harry*

---

[7]  Upson, Georgiana's biological mother, is discussed in the complaint but is not a named defendant in this action.

& *Jeanette Weinberg Found.*, 340 Md. 176, 190 (1995); *see also Van Royen v. Lacey*, 262 Md. 94, 97 (1971)("It would appear to be well settled law in this State that a conspiracy, standing alone, is not actionable.").

Plaintiffs have failed to present any evidence that Defendants entered into an agreement to conduct unlawful activity.  According to Defendants Poulos, Barr, and Burns, none of them had ever met Upson before the day of the incident, and Plaintiffs do not refute that contention.  In addition, the police dispatch that Poulos and Barr received indicated that there was a domestic dispute in progress at the Wallace home and that Upson needed help serving the TPO.  The uncontroverted facts demonstrate that Poulos and Barr went to Wallace's home in response to this dispatch, not because they had conspired with Upson or with each other to arrest Wallace. Therefore, Defendants' motion for summary judgment on the civil conspiracy claim will be granted.

## H.  Counts X and XI: Negligent Training and Supervision

Plaintiffs allege in their complaint that Defendant Montgomery County did not adequately train and supervise its officers. However, neither Plaintiffs nor Defendants address these claims in their motion and cross-motion, respectively.  Therefore, to the extent that the parties are moving for summary judgment on these claims, their motions will be denied.

## I.  Equitable Relief

Finally, Plaintiffs argue that Defendants have been adamant that they did not commit any wrongdoing and would act the same way again under similar circumstances.  Plaintiffs maintain that Defendants' failure to take any corrective action makes injunctive relief both appropriate and necessary.  Plaintiffs also request a declaration of the illegality of Defendants' conduct.  In light of the material issues of fact in this case, it is premature to determine whether Plaintiffs are entitled to equitable relief.

## IV.  Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment and Defendants' cross-motion for summary judgment will be denied in part and granted in part.  A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

45