IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM E. WALLACE, et al.

       v.

PATRICIA A. POULOS, et al.

      :
      :
      :   Civil Action No. DKC 08-0251
      :
      :

**MEMORANDUM OPINION**

On April 21, 2011, a jury awarded Plaintiffs William Wallace and Georgiana Wallace a total of $3,003,001 in nominal, compensatory, and punitive damages because of an incident occurring on the evening of December 27, 2007.  Among other things, the jury concluded that two Montgomery County police officers, Defendants Patricia Poulos and Shon Barr, violated certain of Plaintiffs' constitutional rights, ostensibly in the course of serving a temporary protective order ("TPO").  Both sides subsequently filed post-trial motions:  Plaintiffs filed a motion for equitable relief and for judgment as a matter of law as to three claims rejected by the jury (ECF No. 169), while Defendants moved for a new trial or remittitur (ECF No. 168). Following submission of Defendants' motion, Plaintiffs also moved for limited post-judgment discovery to aid their opposition to Defendants' motion.  (ECF No. 181).  The court now rules pursuant to Local Rule 105.6, no hearing being deemed

necessary.   For the reasons that follow, Plaintiffs' motion for equitable relief and for judgment as a matter of law will be denied, and Defendants' motion for a new trial or remittitur will be granted in part and denied in part.   Plaintiffs' motion for post-judgment discovery will be denied as moot.

## I.   Background

### A.   Factual Background

The following represents the facts as they were presented at trial.   William Wallace is the father of five children, including a daughter named Georgiana, who was three years old at the time of the incident that gave rise to the present litigation.   After a contentious custody dispute in 2006 between Wallace and Georgiana's biological mother, Deanne Upson, a Virginia court awarded Wallace full custody in March 2007.[1] Georgiana now lives with her father and, at all times relevant to this suit, Wallace has had sole custody of her.

On December 27, 2007, Upson appeared *pro se* in the Superior Court of the District of Columbia and requested a civil TPO against Wallace.   Upson led the court to believe that she had been awarded custody of Georgiana and that Wallace had threatened her in some way.   The court accordingly issued the

---

[1] Wallace received full custody after Upson – in contravention of a visitation arrangement – informed the Virginia court that she did not intend to return Georgiana pursuant to a court-imposed custody arrangement.

requested *ex parte* order, which instructed that (a) Wallace was not to "assault, threaten, stalk, harass or physically abuse" Upson or Georgiana, and (b) custody was to be "left under the provisions of the custody case D.C. Superior Court 2004 PCS 1375."

After obtaining the order, Upson drove to Wallace's home in Montgomery County and called the Montgomery County Police Department.  She informed the police that she had an order to pick up her daughter and asked for an officer's help in delivering the order to Wallace.  Montgomery County Police dispatched two officers, Defendants Shon Barr and Patricia Poulos.  Poulos and Barr then accompanied Upson onto Wallace's property.

From there, the parties' accounts diverged substantially.

Wallace says that he was in his house when he spotted a police cruiser coming up his driveway.  He testified that he walked from his house into his garage to open the garage door and speak with the police officers away from Georgiana (who was in the house).  Before he could get out of the garage, however, both officers entered the garage – even after Wallace asked them to wait for him in the driveway.

Wallace testified that Poulos immediately confronted him and asked if he had been in D.C. court that morning.  When he answered that he had not, Poulos purportedly told him he "should

have been" because the "D.C. court h[ad] transferred custody of Georgiana to her mother."   When Wallace offered to show his Virginia custody orders, Poulos responded that she did not care about his order because she had her own order.   Once Wallace was able to look at the D.C. order, he tried to explain to Poulos that it was not a custody order.   She did not respond to his explanations, but instead insisted that Wallace bring Georgiana out of the house.

Wallace testified at trial that Georgiana then appeared at the door to the garage.   He took her back inside the house and insisted she remain there.   He then returned to the garage and told the officers that he would not bring Georgiana out. Wallace testified that the officers responded aggressively, continuing to insist that he bring his daughter out of the house and even pointing a taser at him.   Eventually, said Wallace, the officers grabbed him by the arm and pushed him down onto the hood of a car.   Barr handcuffed him.

Wallace testified that he then watched as Poulos entered his house, although he told her not to enter.   Poulos picked up Georgiana – who by this point was screaming and crying - and carried her out of the house, passing just by Wallace.   Poulos placed Georgiana in Upson's vehicle and then returned to the garage.   She took Wallace's wallet out of his pocket, again

without his permission, to obtain identification.   The officers eventually arrested Wallace and took him into custody.

Officers Poulos and Barr recounted an entirely different version of events regarding their visit to Wallace's home. According to the officers, they arrived at the home and introduced themselves to Wallace when they saw him in his garage.   Poulos informed Wallace that she and Barr were there to serve him with a TPO, and she entered the garage to avoid having to yell while reading it.   Poulos and Barr maintain that Wallace never told them that he had custody of Georgiana.   Wallace apparently became "enraged" and began cursing and screaming almost immediately after Poulos started reading the TPO, asserting that he would not comply with the order and puffing out his chest, balling his fists, and flailing his arms.   Poulos then saw Wallace turn toward Georgiana, who was on the steps leading from the house into the garage, "throw" her into the house and slam the door in her face.[2]   At this time, Georgiana began to cry hysterically.

Wallace then turned back toward Poulos, with his fists balled, and moved toward her.   To protect herself, Poulos stepped back, pulled out her taser, and pointed it at Wallace.

---

[2] Although Barr stated that Wallace was not charged with assault, Barr did testify that he witnessed Wallace "shove" Georgiana from the garage steps back into the home.

Fearing that Wallace would physically attack his partner, Barr stepped in behind Wallace and placed him in handcuffs. Poulos determined that Wallace had violated the TPO by throwing Georgiana through the doorway, and he was placed under arrest. Believing no other adult was in the home, Poulos then entered Wallace's home to retrieve Georgiana and carried her, along with a jacket that she had retrieved just inside the home, outside the garage.[3] Poulos placed Georgiana in Upson's vehicle because Wallace was under arrest for violating the TPO. Both officers testified that Poulos never had any physical contact with Wallace.

The remaining facts are uncontroverted. The officers transported Wallace to the Montgomery County Detention Center's central processing unit, at which time Barr prepared a Statement of Probable Cause and Statement of Charges, which stated that Wallace had "pushed his daughter into the house and shut the door" and that he had violated Section 4.508.1 of the Maryland Family Law Code.[4] Wallace was released when a commissioner determined the arrest lacked probable cause.

---

[3] At trial, Poulos and Barr both stated that Georgiana was not crying when Poulos picked her up and carried her from Wallace's home.

[4] This section provides, in pertinent part:

After his release, Wallace appeared in D.C. Superior Court on December 28 and convinced the judge to vacate the TPO that had been issued to Upson the previous day.  Wallace also hired a private investigator who was able to locate Georgiana at the home of Upson's lawyer.  Wallace testified that, when he arrived, he found Georgiana in stained toddler clothes, shoeless, and with her bags packed for a "trip."[5]  On January 14, 2008, the charges against Wallace were *nolle prossed*.

**B.   Procedural Background**

Plaintiffs filed a complaint against Poulos, Barr, Sergeant Kevin Burns, the officers' shift supervisor, and Montgomery

---

> (c) A law enforcement officer shall arrest with or without a warrant and take into custody a person who the officer has probable cause to believe is in violation of an order for protection that was issued by a court of another state or a Native American tribe and is in effect at the time of the violation if the person seeking the assistance of the law enforcement officer:
>
> (1) has filed with the District Court or circuit court for the jurisdiction in which the person seeks assistance a copy of the order; or
>
> (2) displays or presents to the law enforcement officer a copy of the order that appears valid on its face.

[5] Plaintiffs presented evidence that the December 27, 2007, incident caused Georgiana emotional trauma, including post-traumatic stress disorder.

County on January 28, 2008, asserting violation of their federal and state constitutional rights, as well as numerous state law claims.   The following claims against Poulos and Barr went to trial and were ultimately submitted to the jury: (1) a claim under 42 U.S.C. § 1983 for violations of the First and Fourth Amendments to the United States Constitution; (2) claims for violations of Articles 24 and 26 of the Maryland Constitution; and (3) claims for false arrest/imprisonment, malicious prosecution, assault, battery, and intentional interference with custodial relationship.[6]   While finding in Plaintiffs' favor as to many of the federal and state constitutional claims, the jury declined to hold either of the officers liable for the state law claims of malicious prosecution, assault, and battery.[7]   The jury awarded Wallace $1 in nominal damages and $250,000 in punitive damages against each officer (or $500,000 total).   Additionally, the jury concluded that Georgiana had suffered $3,000 in compensatory damages and awarded $2.5 million in punitive damages against Poulos.

---

[6] The court granted summary judgment in favor of Sergeant Burns and Montgomery County on Plaintiff's § 1983 claims, and Plaintiffs voluntarily dismissed the remaining claims against those Defendants at trial.

[7] The jury did, however, find Poulos liable for falsely imprisoning Georgiana and for intentionally interfering with the custodial relationship between Georgiana and Wallace.   The jury also found both officers liable for falsely arresting and imprisoning Wallace.

On May 19, 2011, Poulos and Barr moved for a new trial or, in the alternative, for remittitur. The same day, Plaintiffs moved for judgment as a matter of law on the following claims that the jury rejected: (1) assault of Wallace by Poulos and Barr; (2) battery of Wallace by Poulos and Barr; and (3) battery of Georgiana by Poulos. Plaintiffs also moved for equitable relief, requesting that the court expunge Wallace's arrest record stemming from the December 27, 2007, incident. On November 29, 2011, Plaintiffs filed a motion for post-judgment discovery "to support their position that they [were] entitled to the full amount of the jury's punitive-damages award." (ECF No. 181-1, at 3). With the exception of Plaintiffs' request for equitable relief, both parties oppose the requests made within the other party's respective motion(s).

## II. Plaintiffs' Renewed Motion for Judgment as a Matter of Law and for Equitable Relief

### A. Renewed Motion for Judgment as a Matter of Law

Plaintiffs have moved for judgment as a matter of law as to three claims that the jury rejected: (1) assault of Wallace by Poulos and Barr; (2) battery of Wallace by Poulos and Barr; and (3) battery of Georgiana by Poulos. Defendants respond in two ways. First, they contend that Plaintiffs waived these arguments by failing to preserve them properly prior to submission of the case to the jury. Second, they argue that the

jury could have reasonably found in favor of Poulos and Barr on each of these claims.   These arguments will be addressed in turn.

### 1.   Failure to Preserve Issues for Review Under Rule 50

Federal Rule of Civil Procedure 50 governs the requirements for making both initial and renewed motions for judgment as a matter of law.   Specifically, Rule 50(b) provides that a party may file a renewed motion for judgment as a matter of law within twenty-eight days of the entry of judgment.[8]   This rule necessarily requires the party to have made an initial motion prior to the time that the court submits the case to the jury, *Price v. City of Charlotte*, 93 F.3d 1241, 1248 (4th Cir. 1996), and that initial motion, made under Rule 50(a), "must specify the judgment sought and the law and facts that entitle the movant to judgment," Fed.R.Civ.P. 50(a)(2).   While the United States Court of Appeals for the Fourth Circuit has rejected a rigid interpretation of this "specificity requirement," it has emphasized the need for "a proper [Rule 50(a)] motion as foundation for a motion [under Rule 50(b)]."   *See Miller v. Premier Corp.*, 608 F.2d 973, 979 n.3 (4th Cir. 1979).   Indeed, a Rule 50(a) motion "is not a mere technicality; it serves vitally

---

[8] Judgment was entered on April 22, 2011, and Plaintiffs filed their motion on May 19, 2011, a date within this twenty-eight-day window.

important interests in the fair conduct of litigation." *Id.* Thus, when considering challenges to Rule 50(b) motions based on lack of specificity in Rule 50(a) motions, the Fourth Circuit has focused principally on whether the moving party, either in written or oral argument, provided sufficient notice to his opponent of the alleged deficiencies in the opponent's case. *See Singer v. Dungan*, 45 F.3d 823, 829 (4th Cir. 1995); *Miller*, 608 F.2d at 979 n.3; *see also Price*, 93 F.3d at 1249 (concluding that a defendant challenging the sufficiency of evidence regarding damages from emotional distress had preserved the issue for review by asserting at oral argument on its Rule 50(a) motion that the plaintiffs had not submitted sufficient evidence of mental or emotional distress).

Here, Plaintiffs moved for judgment under Rule 50(a) at the close of Defendants' case.  In their brief, Plaintiffs requested judgment as a matter of law on numerous claims, including the assault and battery claims against Poulos and Barr.  Defendants contend that such requests were insufficient to preserve these issues for post-verdict review because Plaintiffs did "not argue[] in the body of the memorandum" regarding these claims, even though the motion itself and the headings within the memorandum did mention that Plaintiffs sought judgment under Rule 50 for these counts.

As to the battery claims, Defendants' argument is without merit.  The basis of Plaintiffs' request for judgment on the battery claims – under both motions – relates to the detention and subsequent arrest of Wallace and the act of carrying Georgiana from the home and placing her in Upson's vehicle. Plaintiffs' brief in support of their Rule 50(a) motion stated these facts in detail and requested judgment as a matter of law because Defendants had failed to provide the jury with a "legally sufficient evidentiary basis" to reject these facts and find in their favor.  (ECF No. 151-1, at 1).  During oral argument of the Rule 50(a) motion, Plaintiffs' counsel again set forth these facts and asserted that Poulos and Barr had failed to submit evidence that would permit a reasonable juror to find that their actions were legally justified.  While Plaintiffs' Rule 50(b) motion may address these battery claims in greater detail than the Rule 50(a) motion, the renewed motion sets forth the same basic facts and arguments as the initial motion, thereby giving Defendants adequate notice of the purported deficiencies in their defense to the battery claims.

The portion of Plaintiffs' Rule 50(b) motion seeking judgment against Poulos and Barr for Wallace's assault claim, however, requires a different result.  The alleged use of the taser by one of the officers is the sole factual basis on which Plaintiffs now seek judgment as a matter of law on Wallace's

12

assault claim. In the brief accompanying their Rule 50(a) motion and in oral argument of that motion, however, the only basis articulated by Plaintiffs' counsel for judgment on the assault claim was the officers' act of detaining and subsequently arresting Wallace. At no point in either written or oral argument did Plaintiffs' counsel ever state that Plaintiffs sought judgment on this claim because one of the officers took out a taser and pointed it at Wallace. Because Plaintiffs did not move for judgment on this basis at trial, they failed to provide Defendants with notice that their defense of the assault claim may have been deficient in this respect. Permitting Plaintiffs to raise the issue now would not comport with the principle of ensuring "fair conduct of litigation," *Singer*, 45 F.3d at 829, and, as a result, their Rule 50(b) motion on the assault claim is not properly preserved.[9]

---

[9] Courts may only consider arguments that the moving party failed to preserve under Rule 50 when necessary "to avoid manifest injustice to the moving party." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2$^d$ Cir. 1993) (internal quotation marks omitted). That standard is not met here because, even if the issue had been preserved, Plaintiffs failed to show that they were entitled to judgment as a matter of law on Wallace's assault claim. Assault is the attempt to cause a harmful or offensive contact with another or to cause an apprehension of such contact, *Lee v. Pfeifer*, 916 F.Supp. 501, 505-06 (D.Md. 1996), but such claims cannot proceed where legal justification exists for the assault. *Hines v. French*, 157 Md.App. 536, 551 (2004). Poulos and Barr both testified that they feared Wallace would "assault" Poulos because he became "enraged" when she attempted to serve the TPO and approached her with his fists

2.  **Judgment as a Matter of Law on Plaintiffs' Battery Claims**

Because Plaintiffs failed to preserve the argument they now raise with respect to Wallace's assault claim, their Rule 50(b) motion need only be considered as to their battery claims. "Under Rule 50, a court should render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (internal quotation marks omitted). In other words, "[j]udgment as a matter of law is proper only when there can be but one reasonable conclusion as to the proper judgment." *Volvo Cars of N. Am., LLC v. United States*, 571 F.3d 373, 381 (4th Cir. 2009) (internal quotation marks omitted). If there was sufficient evidence for a reasonable jury to find in the non-movant's favor, the motion must be denied. *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 292 (4th Cir. 2009), *cert. denied*, 130 S.Ct. 114 (2009); *see also Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255,

---

balled and arms flailing.  Only then, according to the officers, did Poulos remove her taser from its holster and point it at Wallace.  On these facts, the jury could reasonably find that neither officer assaulted Wallace.  Indeed, it could have credited the officers' testimony and concluded that Barr did not point any protective instrument at Wallace and that Poulos did so only in self-defense.  (*See* ECF No. 154, Jury Instructions, at 25).

259 (4th Cir. 2001) (emphasizing the court's limited purpose of evaluating the sufficiency of the evidence, as courts are "compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them"). In making its determination, the trial court must consider "the record as a whole in the light most favorable to the non-movant." *Dotson*, 558 F.3d at 292.

Wallace asserts that Poulos and Barr battered him by detaining and subsequently arresting him without cause, and that Poulos battered Georgiana by picking her up and carrying her to Upson's car. "A battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 355 Md. 593, 600 (1999). Thus, in the absence of physical contact, a battery claim must fail. *Griffith v. Truette*, 866 F.Supp. 254, 257 (D.Md. 1994); *Claiborne v. Cahalen*, 636 F.Supp. 1271, 1280 (D.Md. 1986). Additionally, when defendants have legal justification for their actions, a claim for battery cannot advance. *Hines*, 157 Md.App. at 551. For this reason, "officers are privileged to commit a battery pursuant to a lawful arrest," as long as they use reasonable force in doing so. *French v. Hines*, 182 Md.App. 201, 265 (2008). The jury instructions in this case informed the jury regarding these principles. (*See generally* ECF No. 154).

Viewing the facts in the light most favorable to
Defendants, the jury could have found that neither officer
committed a battery during the visit to Wallace's home.[10]  First,
Poulos maintains that she never touched Wallace, an assertion
fatal to Wallace's battery claim if credited by the jury.
Second, the version of events set forth by Poulos and Barr
demonstrates that legal justification may have existed for
Wallace's arrest.  The officers both testified that Barr
handcuffed Wallace in order to protect Poulos after Wallace
approached her with his fists balled and arms flailing, thus
indicating that Barr acted in defense of his partner – a legal
justification for battery of which the jury was advised.  (*See
id.* at 25.).  Additionally, both officers stated that they saw
Wallace shove Georgiana from the garage into the house while
they were serving the TPO, and that the TPO expressly directed

---

[10]  Throughout their Rule 50(b) motion, Plaintiffs assert
that the court must grant their request for judgment as a matter
of law because the jury found in their favor on many of the
federal and state constitutional claims and on the state law
claims for false arrest/imprisonment.   To the extent that
Plaintiffs seek to argue that the jury's verdicts are
inconsistent and that the court should grant judgment in their
favor for this reason, they have failed to pursue the proper
remedy.  *See Talkington v. Atria Reclamelucifers Fabrieken BV*,
152 F.3d 254, 257 (4th Cir. 1998) (explaining that a motion for a
new trial, rather than a motion for judgment as a matter of law,
is the proper remedy to pursue in the face of an inconsistent
jury verdict), *cert. dismissed*, 525 U.S. 1062 (1998); *Atlas Food
Sys. & Servs., Inc v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587,
598 (4th Cir. 1996) (same).

Wallace not to "assault, threaten, stalk, harass or physically abuse" Upson or Georgiana.   According to Poulos, Wallace was placed under arrest, pursuant to Section 4.508.1 of the Maryland Family Law Code, because his action of shoving Georgiana appeared to violate the TPO.   Indeed, the Statement of Charges prepared by Barr stated that Wallace had "pushed" his daughter and that he was arrested for violation of the order.   If the jurors believed this testimony, they could have found that Barr was legally justified in placing Wallace in his police cruiser and transporting him to the Montgomery County Detention Center.

Following from the events above, the jury could also have found that Poulos was legally justified in carrying Georgiana out of the home to Upson's vehicle, and thus did not commit battery when she did so.   Poulos testified that she only approached Georgiana and picked her up after determining that Wallace was under arrest and would be transported to the police station.   Believing that no other person was in the home, Poulos stated that she feared leaving three-year-old Georgiana home alone.   Poulos explained that she carried Georgiana from the home for that reason and placed her with Upson, who had provided documentation that she was Georgiana's biological mother.   Given these circumstances, the jury could have reasonably concluded that Poulos's contact with Georgiana was neither offensive nor harmful.

For these reasons, Plaintiffs' renewed motion for judgment as a matter of law will be denied.

### B.   Equitable Relief

Plaintiffs have also moved for equitable relief, requesting that the court expunge Wallace's arrest record stemming from the December 27, 2007, incident.   Defendants do not oppose this request and ask only that the court fashion relief in accordance with the provisions relating to expungement found in the Criminal Procedure Article of the Maryland Code.   *See* Md. Code. Ann., Crim. Pro., §§ 10-101 *et seq.*

Expungement of a state criminal record, however, "must be sought through the state court system." *Dennis v. Nat'l R.R. Passenger Corp.*, 34 F.App'x 950 (4th Cir. 2002); *see also Azeez v. Keller*, No. 5:06-0106, 2010 WL 1380024, at *4 (S.D.W.Va. 2010) (finding that a state circuit court, rather than a federal district court, was "the proper forum" for a motion to expunge a state criminal record where a state statute identified the state court as the appropriate court in which to seek expungement), *appeal dismissed*, 408 F.App'x 685 (4th Cir. 2011).   Similar to the state statute at issue in *Azeez*, Sections 10-103 through 10-106 of the Maryland Criminal Procedure Code set out the process for requesting expungement in Maryland and specify the appropriate state courts in which such requests should be filed. Because Plaintiffs seek expungement of a state arrest record and

18

Maryland provides a procedure for expungement in its state courts, Plaintiffs' request for equitable relief will be denied.

**III. Defendants' Motion for a New Trial (or Remittitur)**

    **A.   Standard of Review**

Defendants move for a new trial pursuant to Federal Rule of Civil Procedure 59. Because "every litigant is entitled to one fair trial, not two," *Glassman Const. Co. v. United States ex rel. Clark-Fontana Paint Co.*, 421 F.2d 212, 215 (4th Cir. 1970), the decision of whether to grant or deny a motion for a new trial lies within the discretion of the district court, *King v. McMillan*, 594 F.3d 301, 314 (4th Cir. 2010). The court must exercise its discretion to grant a new trial only if the verdict (1) is against the clear weight of the evidence, (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001). Put differently, such a motion should be granted only when it "is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Pathways Psychosocial v. Town of Leonardtown, Md.*, 223 F.Supp.2d 699, 706 (D.Md. 2002) (internal marks omitted). In making this determination, the court may weigh the evidence and consider the credibility of witnesses – and may reverse even if the verdict

is supported by substantial evidence.  *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1237 (4th Cir. 2010).

Importantly, Defendants do not ask to start the trial from the beginning.  Rather, they ask that the court order a new trial on the issue of punitive damages.  Such a partial new trial may be ordered when "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 290 (4th Cir. 2000).  Courts have often recognized that damages, and punitive damages in particular, are such an issue.  *See, e.g.*, *Atlas Food Sys. & Servs., Inc.*, 99 F.3d at 598 (same).

As an alternative to a new trial on punitive damages, Defendants also seek remittitur.  "Remittitur, which is used in connection with Fed.R.Civ.P. 59(a), is a process . . . by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998) (quotation marks omitted).  The decision as to whether damages should be subject to remittitur also lies within the discretion of the trial court.  *Robles v. Prince George's Cnty., Md.*, 302 F.3d 262, 271 (4th Cir. 2002), *cert. denied*, 538 U.S. 945 (2003).

## B.   Analysis

Defendants suggest they are entitled to a new trial on the issue of punitive damages for two reasons.  First, they contend that the jury was improperly told that the County would indemnify Defendants against any punitive damages award. Second, they argue that the punitive damages award is so excessive that it violates their right to due process.

### 1.   Reference to Indemnification

Defendants first argue that the court inappropriately "permitted Plaintiffs to inform the jury that the government [(*i.e.*, the County)] was going to indemnify the officers for any award of damages." (ECF No. 168, at 8).  In opening statements and closing argument, counsel for Plaintiffs told the jury that Montgomery County would pay any punitive damages award. Defendants protest that these references introduced information that is irrelevant to the issue of punitive damages; they further maintain that "[it] is clear . . . that the introduction of this evidence caused the jury to award amounts that would punish the County . . . rather than the actual Defendants." (*Id.* at 8-9).  Plaintiffs respond that they were permitted to mention the indemnification agreement because the Defendants submitted a stipulation concerning indemnification in lieu of other relevant financial information.

At the outset, tt is not clear whether Defendants' objection has even been preserved.  This matter was discussed by the parties just before opening statements, when Plaintiffs' counsel explained that he planned to reference the indemnification agreement in his opening statement.  When the court asked whether there was any objection, counsel for the Defendants responded:  "I object to it only because it's no different than if someone had insurance [and they wanted to] mention the insurance company.  I mean that's essentially what we have."  When the court then asked whether such insurance would be relevant to the issue of punitive damages, counsel for the Defendants argued that such information should not go before the jury *only* because the Plaintiffs had not yet established their entitlement to punitive damages.  He conceded, however, that "at the point that . . . the elements necessary to get to punitive damages have been established, then [Plaintiffs] can make that argument."  Thus, the court understood Defendants to be arguing that it was premature to mention evidence of indemnification.  They did not suggest, as they do now, that the indemnification agreement was entirely irrelevant to the issue of punitive damages.

"A motion for a new trial should not be granted . . . when the moving party has failed to timely object to the alleged impropriety giving rise to the motion."  *Dennis v. Gen. Elec.*

*Corp.*, 762 F.2d 365, 367 (4th Cir. 1985); *see also* 11 Charles Alan Wright, et al., *Federal Practice & Procedure* § 2805 (2011 supp.) ("A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result."). In this case, Defendants most certainly failed to object on the ground they now raise. *Cf. Mourning v. Brown Lincoln-Mercury, Inc.*, No. 96-1171, 1997 WL 626543, at *4 (4th Cir. Oct. 10, 1997) ("[A]n objection on specific grounds does not preserve the error for purposes of appeal on other grounds." (internal quotation marks omitted)); Fed.R.Evid. 103(a) ("Error may not be predicated on a ruling that admits . . . evidence . . . unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."). But perhaps more troublingly, Defendants' original objection tacitly indicated their belief that the indemnification agreement *would* be relevant to the issue of punitive damages. To consider Defendants' objection now would allow them to upset a jury verdict with a new theory that was never put before the court at an appropriate time.

But even had Defendants preserved their objection, their argument would fail, as "a defendant's financial position is a proper consideration in assessing punitive damages." *Stamathis*

*v. Flying J, Inc.*, 389 F.3d 429, 442 (4th Cir. 2004); *see also, e.g., Cortez v. Trans Union, LLC*, 617 F.3d 688, 718 (3[d] Cir. 2010); *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262 (10th Cir. 2000).   Indeed, Defendants' own proposed jury instructions acknowledged that "the defendant's ability to pay" was relevant (ECF No. 127, at 2), and they make no present argument that the jury should have been barred from hearing *all* information concerning their finances.[11]

Nevertheless, Defendants insist that, while financial information as a general matter may be relevant to the issue of punitive damages, the information on indemnification presented in this case is different.   A substantial body of law suggests otherwise.   Although the Fourth Circuit has not spoken directly to the issue,[12] other courts have concluded that proof of

_____

[11] It might be the case that Plaintiffs were not entitled to introduce evidence concerning the Defendants' financial condition until Defendants put their own financial condition at issue.   Defendants, however, have not made any such argument. All parties appeared to agree - either at the pre-trial conference or at some point in court - that it would be Plaintiffs' burden to put on evidence of Defendants' ability to pay.

[12] The Fourth Circuit has explained "that the coverage or noncoverage of a party by liability insurance is not probative of any issue *in a negligence case* and introduction of that subject is reversible error."   *Aldridge v. Balt. & Ohio R.R. Co.*, 789 F.2d 1061, 1065 (4th Cir. 1986) (emphasis added), *vacated on other grounds by* 486 U.S. 1049 (1988).   That conclusion, however, does not apply here, as the ordinary negligence case does not involve punitive damages.

insurance[13] or indemnification in other forms is relevant in determining punitive damages. *See, e.g.*, *Fleegel v. Estate of Boyles*, 61 P.3d 1267, 1272 & n.20 (Alaska 2002) (collecting cases); *Schaefer v. Ready*, 3 P.3d 56, 59 (Idaho Ct. App. 2000); *Wheeler v. Murphy*, 192 W.Va. 325, 423 (1994); *Miller v. Szelenyi*, 546 A.2d 1013, 1019 (Me. 1988); *Ayers v. Christiansen*, 222 Kan. 225, 229-30 (1977); *cf. Mathie v. Fries*, 121 F.3d 808, 816 (2[d] Cir. 1997) ("[W]e rule that a fact-finder can properly consider the existence of such an agreement as obviating the need to determine whether a defendant's limited financial resources justifies some reduction in the amount that would otherwise be awarded."); *Kemezy v. Peters*, 79 F.3d 33, 37 (7th Cir. 1996) ("The defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab."). *But see, e.g.*, *City of West Allis v. Wis. Elec. Power Co.*, 248 Wis.2d 10, 46 (Wis.Ct.App. 2001) (finding evidence of punitive damages insurance inadmissible). These

---

[13] Although this case involves an indemnification agreement, not insurance, the insurance cases are analogous for two reasons. First, as Defendants themselves recognize, indemnification acts as a type of quasi-insurance, in that Defendant are receiving indemnification from a collateral source. Second, the information concerning the indemnification was produced in discovery in lieu of submitting information concerning Defendants' individual insurance policies. Thus, Defendants intended that the agreement was to stand in the place of such insurance.

cases seem to recognize the reality that "the ultimate source of payment" is relevant to the issue of punitive damages because "[t]he jury must know the impact an award will have on the defendant to properly assess punitive damages." *Perrin v. Anderson*, 784 F.2d 1040, 1047-48 (10th Cir. 1986).

Defendants nevertheless invoke Federal Rule of Evidence 411, which limits the admissibility of "evidence that a person was or was not insured against liability." A strict, technical reading of the rule would suggest it inapplicable on its face, as indemnification is different from liability insurance. *See, e.g.*, *Galaxy Computer Servs., Inc. v. Baker*, 325 B.R. 544, 551 n.2 (E.D.Va. 2005) ("The Court does not consider the indemnification agreement to be liability insurance for purposes of Rule 411."). Yet even assuming the rule does apply to this case, it only states that insurance is inadmissible "upon the issue whether the person acted negligently or otherwise wrongfully"; the rule "does not require" such evidence to be excluded when it is "offered for another purpose." Fed.R.Evid. 411. The indemnification agreement in this case was only used in the damages context and therefore would not fall within the scope of the Rule 411. *See, e.g.*, *Dallas v. Goldberg*, No. 95 Civ. 9076(LTS), 2002 WL 1013291, at *5 (S.D.N.Y. May 20, 2002) (explaining that, where indemnification evidence was offered on issue of punitive damages, Rule 411 was "irrelevant to the issue

at hand"); *DSC Commc'ns Corp. v. Next Level Commc'ns*, 929 F.Supp. 239, 248 (E.D.Tex. 1996) (collecting authorities); *see also* 23 Charles Alan Wright, et al., *Federal Practice & Procedure* § 5364 (2011 supp.) ("Rule 411 does not prohibit the use of evidence of insurance where it is relevant to the question of damages or punitive damages." (footnotes omitted)).

Defendants also rely heavily on a seventeen-year-old case from the United States Court of Appeals for the Ninth Circuit, *Larez v. Holcomb*, 16 F.3d 1513 (9th Cir. 1994). In *Larez*, the plaintiff's attorney informed the jury that the City of Los Angeles would indemnify the defendant - a police officer facing a § 1983 claim - for any punitive damages. *Id*. at 1520. The Ninth Circuit determined that the indemnification was irrelevant and reversed, explaining:

> The City was not a party to this suit, and allowing the jury to hear that the City might cover [the officer] for any punitive damages award could only have distracted the jury from its task of arriving at a punitive award appropriate to the wrongdoing of [the officer].
>
> . . .
>
> . . . The fact that taxpayers have decided through their representatives that it is to their benefit as taxpayers to help out the officers is irrelevant to the determination of a suitable award. When a city pays for punitive damages, of course, the deterrent effect of the sanction is diminished considerably, but, from the perspective of the wrongdoer, who pays nothing regardless

27

of the size of the award, this reduction in
"sting" occurs no matter what amount the
jury assesses. Informing the jury of
indemnification thus would provide a
windfall to plaintiffs at taxpayers'
expense, with little appreciable increase in
deterrence.

*Id.* at 1521 (citations and internal quotation marks omitted).

Judge Pregerson dissented, noting that – rather than resulting
in a windfall to the plaintiff – "jurors as taxpayers arguably
might lower a punitive damage award where they know that the
city, not the defendant, will bear the costs." *Id.* at 1525
(Pregerson, J., concurring in part and dissenting in part).

The rationale advanced in *Larez* is unpersuasive. Far from
"distracting" the jury, the indemnification agreement in this
case would be relevant to several aspects of the jury's punitive
damages determination. For one, informing the jury of the
indemnification agreement makes jurors aware that Defendants'
ability to pay is essentially a moot point. For another,
telling the jury about indemnification ensures that jurors have
an accurate understanding of the likely deterrence effect of
their judgment. When an officer is fully indemnified, specific
deterrence is substantially diminished and perhaps eliminated.[14]
Armed with that knowledge, the jury could direct its attention

---

[14] The best one could hope for is a form of indirect
deterrence wherein the County itself acts in response to paying
the award.

to other punitive damages considerations, such as general deterrence. The Ninth Circuit failed to consider these ideas; instead, it assumed that reference to indemnification should be barred in the context of punitive damages for the same reasons that such references are barred in the compensatory damages context. *See id.* at 1521 ("The fact that the City is authorized to indemnify officers for punitive damages was no more relevant to the jury's calculation of an appropriate punitive award against [the officer] than the fact that the City pays compensatory damages was relevant to the jury's determination of the actual damages suffered by [the plaintiff]. The same common law principle and equitable considerations apply."). Yet that reasoning overlooks the fact that a defendant's wealth is irrelevant to compensatory damages, but consideration of that same issue is "integral" in the realm of punitive damages. *CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 706 (1st Cir. 1995). Lastly, the Ninth Circuit speculated that a jury informed of indemnification would inflate the jury award. But as Judge Pregerson observed, it seems just as likely that jurors would be *less* inclined to award a substantial punitive damage award if they were aware that they (as taxpayers) would feel the "sting." The non-binding authority of *Larez* does not call for a new trial in this case, and the court will not order a new trial on the

issue of punitive damages because of the reference to the indemnification agreement.[15]

### 2.   Unconstitutionally Excessive Punitive Damages

Defendants also assert that the punitive damage awards of $500,000 and $2.5 million to Wallace and Georgiana, respectively, were so excessive as to violate their due process rights.  Plaintiffs largely respond by emphasizing the perceived reprehensibility of the acts involved in this case.  Defendants have the better end of this argument.

Plaintiffs first suggest that Defendants "were not denied due process" because the jury was "properly instructed on the issue of punitive damages and [D]efendants made no objections to the instructions that were given."  (ECF No. 171, at 18).  By now, however, it is axiomatic that "the Constitution imposes a substantive limit on the size of punitive damages awards." *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 420 (1994).  Thus,

_____

[15] Finding no preserved, prejudicial error, there is also no reason to order remittitur on this ground.  In any event, it would be inappropriate to order remittitur on the basis of the error alleged here.  "Where, as in this case, a jury's undifferentiated lump sum damage award is [allegedly] made up of a number of properly compensable items and one noncompensable item, use of remittitur involves judicial correction of a jury's verdict by a process of determining an unknown fraction of an unknown portion of an unknown whole." *Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186 (4th Cir. 1982) (internal quotation marks and footnote omitted), *cert. denied*, 460 U.S. 1102 (1983). "This goes beyond the traditional bounds of the device for correcting jury excess." *Id.* at 206.

a plaintiff may not appeal to the mere fact that the jury was properly instructed to preserve even the most egregious award. Indeed, the Supreme Court of the United States adopted its current approach to punitive damage awards partly because "[j]ury instructions typically leave the jury with wide discretion in choosing amounts," *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003), which potentially opens the door to arbitrariness.

The Supreme Court has articulated three guideposts for courts to consider when determining whether a jury's award of punitive damages violates due process: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418. Together, these guideposts serve to ensure that defendants have fair notice about the potential penalty they face for engaging in prohibited conduct. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). Where a punitive damages award is "so grossly excessive that it furthers no legitimate purpose," *Menghi v. Hart*, 745 F.Supp.2d 89, 110 (E.D.N.Y. 2010) (internal quotation marks omitted), the defendants lack such notice, and

the punitive damages award violates due process, *see BMW of N. Am., Inc.*, 517 U.S. at 574-85.

Before considering these guideposts in detail, however, a threshold matter must be resolved.  The parties disagree about the scope of facts relevant to a determination of whether the punitive damages award is excessive.  According to Defendants, those facts should be limited to the officers' entry into Plaintiffs' garage and home and the seizure of Wallace – not the seizure of Georgiana – because the federal claims for which the officers were found liable related only to these facts.  Plaintiffs disagree, referencing not only the facts cited by Defendants, but also relying heavily on facts related to Georgiana's unlawful seizure, the subject of state law claims only.  Limiting the facts to those integral to the federal claims is the more reasoned choice.  The jury in this case expressly declined to award any punitive damages to either Plaintiff in relation to any of the state law claims.  As a result, considering facts integral to those state claims, but not the federal claims, in determining the reasonableness of the federal punitive damages awards would ignore the jury's conclusion that those facts did not warrant imposition of punitive damages.  *Cf. Lee v. Edwards*, 101 F.3d 805, 809-10 (2d Cir. 1996) (evaluating only the facts related to a malicious prosecution claim when determining whether a punitive damages

award violated due process, even though the case also involved assault and battery claims against a police officer, because the plaintiff had received punitive damages only as to the malicious prosecution claim).

With that threshold issue resolved, the guideposts can now be considered. "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of N. Am., Inc.* 517 U.S. at 575. Courts are instructed to consider the following factors when evaluating this first guidepost:

> [W]hether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419. Additionally, the Supreme Court has cautioned that a punitive damages award need not be sustained simply because one of these factors weighs in a plaintiff's favor. *Id.* (further reasoning that the absence of all of these factors will render "any award suspect"). In performing this analysis, the reviewing court must accept the underlying facts found by the jury. *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1120 (9th Cir. 2008).

The first two factors arguably support a finding of reprehensibility, and thus a significant punitive damages award. The officers' conduct, as presented by Wallace and presumably credited by the jury, involved at least the threat of violence, a circumstance viewed as reprehensible, particularly when it involves an official using state authority. *Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 53 (1st Cir. 2009).[16] According to Wallace's testimony, the officers created such a threat of violence here. Poulos and Barr – both armed – became increasingly aggressive when Wallace refused to bring Georgiana out of the house, ultimately detaining him with force and entering his garage despite repeated requests that they leave his property immediately. *See id.* (reasoning that a mayor's conduct created a significant threat of violence where he verbally accosted the plaintiffs and used armed police officers to detain them). Additionally, Wallace testified that three-year-old Georgiana witnessed at least part of these events and was emotionally distraught as a result of the entire encounter. These same facts also suggest that the officers' conduct

---

[16] This rule applies even if actual physical injury does not result from the threat of violence. *Id.* The jury appeared to reject Wallace's assertion that he suffered physical injury as a result of the incident by finding that neither officer committed battery and awarding him only $1 in nominal damages.

"evinced an indifference to or a reckless disregard" for Plaintiffs' health and safety. *See id.*

Other factors relevant to a determination of reprehensibility, however, weigh against a substantial punitive damage award. There is no evidence that Poulos and Barr had acted similarly on any prior occasion, making this an "isolated incident," a consideration that other courts have found highly persuasive when considering whether a punitive damages award violates due process. *See Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 30 (1st Cir. 2010); *Mendez*, 540 F.3d at 1121. Plaintiffs here also were not financially vulnerable, as Wallace was (and remains) a partner in a reputable law firm and earns a significant annual salary in this position. *See Mendez-Matos*, 557 F.3d at 54 (noting that "no evidence" suggested that the plaintiff, the supervisor of a crew constructing a large government center, was financially vulnerable).[17]  With the factors split regarding the reprehensibility of Defendants'

---

[17] Indeed, the jury explicitly rejected Wallace's contention that this incident rendered him financially vulnerable by refusing to award him any compensation for income that he purportedly lost as a result of the incident's impact on his work reputation. *See Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 153 (4th Cir. 2008) (noting that the plaintiff's financial vulnerability weighed in favor of upholding an $80,000 punitive damages award because the bank's actions had made it "impossible" for the plaintiff to obtain a necessary new loan).

conduct, there appears to be some disconnect between the reprehensibility of the officers' conduct in relation to the federal claims and the substantial punitive damages awarded by the jury. *Mendez*, 540 F.3d at 1120. The remaining guideposts thus take on particular importance.[18]

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual [or potential] harm inflicted on the plaintiff." *BMW of N. Am., Inc.*, 517 U.S. at 580. There is no bright-line ratio that punitive damages awards cannot exceed, *State Farm*, 538 U.S. at 424-25, because the focus of the inquiry is on whether "the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered," *Mendez-Matos*, 557 F.3d at 53. For this reason, although in practice "few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy . . . due

---

[18] The final factor related to reprehensibility – whether the harm resulted from intentional malice, trickery, or deceit, as opposed to mere accident – fails to weigh clearly in favor of either party. Wallace testified that the officers fabricated facts about the hearing in D.C. Superior Court and lied to him about the hearing in order to trick him into relinquishing custody of Georgiana. Poulos and Barr, however, both testified that they did not discuss the hearing with Wallace at all because they knew nothing about it, suggesting that any confusion about the language of the order was "mere accident." Because the analysis of reprehensibility should be based upon the facts as found by the jury and it is unclear which account the jury credited, it would be improper to consider this factor in resolving Defendants' motion.

process," courts have upheld higher ratios in § 1983 cases, particularly those involving an award of nominal damages or insignificant compensatory damages. *See, e.g.*, *Mendez*, 540 F.3d at 1121-22 (upholding an award of $5,000 when the plaintiff received $1 in nominal damages).

Even considering these principles, the punitive damages awards here are clearly excessive. The jury awarded Wallace $1 in nominal damages, but $500,000 in punitive damages against the defendants – a "breathtaking" ratio of 500,000:1. *See BMW of N. Am., Inc.*, 517 U.S. at 583. Similarly, the punitive damages award to Georgiana against Poulos was $2.5 million, more than 833 times her compensatory award of $3,000. *See id.* (reasoning that ratios exceeding 500:1 "must surely raise a suspicious judicial eyebrow" (internal quotation marks omitted)). The second guidepost may indeed have reduced relevance in the context of § 1983 cases, but that is not to say that it has no relevance. *See Mendez*, 540 F.3d at 1122 ("In this case, the jury awarded a staggering $250,000 in punitive damages, even though the jury found that [the plaintiff] suffered no compensable injury from [the defendant's] actions."). The substantial disparity between the compensatory and punitive damages in this case thus renders the amount of the punitive awards highly suspect.

The final guidepost requires comparison of the punitive damages award to civil or criminal penalties that have been authorized or imposed for comparable misconduct. *BMW of N. Am., Inc.*, 517 U.S. at 583. The parties disagree about the appropriate civil and criminal benchmarks to apply in this case, but this dispute need not be resolved here. Courts addressing § 1983 cases have noted that Congress did not specify a "quantum of damages" when drafting that section. *Casillas-Diaz v. Palau*, 463 F.3d 77, 86 (1st Cir. 2006). Therefore, when using this guidepost to determine whether a defendant had fair notice about the amount of the award, the appropriate benchmark is the amount of punitive damages awarded in analogous cases. *Id.; Davis v. Rennie*, 264 F.3d 86, 117 (1st Cir. 2001), *cert. denied*, 535 U.S. 1053 (2002).

The cases cited by Plaintiff in support of the punitive damages awards here are largely inapposite because the vast majority of them do not involve police misconduct at all.[19]  In the absence of significant physical injury, punitive damage awards in analogous § 1983 cases are generally far smaller than

---

[19] Plaintiffs' brief does cite two cases involving police misconduct: *Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996), and *Williams v. Kaufman County*, 352 F.3d 994 (5th Cir. 2003). Both of those cases, however, actually weigh against upholding the awards in the present case because the awards ultimately sustained in those cases were for $75,000 and $15,000, respectively – a mere fraction of the awards challenged here.

the awards given here.   *See Mendez-Matos*,  557 F.3d at 56
(reducing a punitive damages award from $350,000 to $35,000
where the defendant mayor had verbally accosted the plaintiffs
and used armed police officers to detain them and impound their
personal property); *Mendez*, 540 F.3d at 1122 (upholding a
district court's reduction of punitive damages from $250,000 to
$5,000 where the police locked a plaintiff in a police car,
subsequently drove her to the police station and questioned her
despite not having probable cause to do so, and entered and
searched her home illegally in the interim); *Sevigny v. Dicksey*,
846 F.2d 953, 957 (4th Cir. 1988) (upholding a $21,000 punitive
damages award in a § 1983 case for unlawful arrest where a
police officer arrested a plaintiff for numerous crimes despite
overwhelming evidence of her innocence, interfered with her
attempt to post bond, and initiated an investigation by social
services into her parental fitness).   In light of these cases,
the substantial punitive damages awards to Plaintiffs violated
due process.[20]   The facts of this case and consideration of the

---

[20]  Plaintiffs purportedly filed their motion for post-
judgment discovery to support their position "that they [were]
entitled to the full amount of the jury's punitive-damages
award."   (ECF No. 181-1, at 3).   In that motion, Plaintiffs
sought discovery from Montgomery County about post-verdict
procedures it had implemented to prevent future constitutional
violations similar to the ones that occurred in this case.   But
because the trial record makes clear that the punitive damages
awards Plaintiffs received were unconstitutionally excessive,

foregoing guideposts, however, do support the following maximum punitive damages awards:  $20,000 to Wallace ($10,000 against both Poulos and Wallace), and $125,000 to Georgiana ($125,000 against Poulos).

Even after concluding that the punitive damages awards violated Defendants' due process rights, the question of remedy remains.  When the court determines that a punitive damages award is unconstitutionally excessive, it might be reasonable to order a new trial on punitive damages, with or without remittitur.  *See Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1151 (9th Cir. 2002) (discussing this option).  Alternatively, a number of courts have allowed or directed the trial court to enter judgment for the maximum amount of constitutionally acceptable punitive damages.  *See id.*  As Defendants note in their motion papers, the latter approach is not "remittitur" in the purest sense, but is instead entry of judgment as a matter of law:

> A constitutionally reduced verdict, therefore, is really not a remittitur at all.  A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages.  The court orders a remittitur when it believes the jury's award is unreasonable on the facts.  A constitutional reduction, on

---

there is no need for any post-judgment discovery in this case.  Plaintiffs' motion for post-judgment discovery will, therefore, be denied as moot.

> the other hand, is a determination that the
> law does not permit the award.    Unlike a
> remittitur, which is discretionary with the
> court and which we review for an abuse of
> discretion, a court has a mandatory duty to
> correct   an   unconstitutionally   excessive
> verdict   so   that   it   conforms   to   the
> requirements of the due process clause.

*Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th

Cir. 1999) (citations omitted), *cert. denied*, 528 U.S. 931

(1999); *accord Ross v. Kansas City Power & Light Co.*, 293 F.3d

1041, 1049 (8th Cir. 2002); *Snyder v. Phelps*, 533 F.Supp.2d 567,

575, 592 (D.Md. 2008) (quoting *Johansen*), *reversed on other*

*grounds by* 580 F.3d 206 (4th Cir. 2009), *aff'd*, 131 S.Ct. 1207

(2011); *cf. Leatherman Tool Grp., Inc.*, 285 F.3d at 1151

(concluding that an appellate court may simply lower the amount

of punitive damages itself, without remanding for a new trial);

*Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1351 (Fed. Cir. 2001)

(finding that a new trial was not required where "reduction in a

damages award [is based] on purely legal grounds"), *cert.*

*denied*, 534 U.S. 1035 (2001).[21]

------

[21] The Fourth Circuit has not squarely reached this issue.
Instead, the court indicated "it was not clear to us that, for
example, post-*BMW*, the Court would necessarily conclude that a
plaintiff  would  be  denied  his  Seventh  Amendment  jury  right
unless he were offered a completely new trial (or at least a
completely new trial on damages) following an appellate decision
that damages beyond a specified amount would be excessive *as a
matter of constitutional law*."  *In re Bd. of Cnty. Supervisors
of Prince William Cnty., Va.*, 143 F.3d 835, 840 (4th Cir. 1998).

When reaching this conclusion, courts have reasoned that the district court's power to reduce an unconstitutionally excessive punitive damages award and enter judgment directly rests in Federal Rule of Civil Procedure 50. *E.g.*, *Johansen*, 170 F.3d at 1331; *Sherman v. Kasotakis*, 314 F.Supp.2d 843, 868 (N.D.Iowa 2004) (quoting *Johansen*). Those courts, however, do not specify whether Rule 50(a) or Rule 50(b) applies. As explained with regard to Plaintiffs' motion above, Rule 50(a) pertains to initial motions for judgment as a matter of law, but relates to motions made prior to submission of the case to the jury. Rule 50(b) addresses renewed motions for judgment as a matter of law that are made following the jury's verdict. Except in circumstances necessary "to avoid manifest injustice to the moving party," courts may not consider arguments under Rule 50(b) that the moving party failed to preserve under Rule 50(a). *Samuels*, 992 F.2d at 15 (internal quotation marks omitted).

Here, Defendants obviously could not have challenged the punitive damages award as excessive before submission of the case to the jury. Therefore, a request for "remittitur" without the offer of a new trial – which the court will construe as a request for judgment as a matter of law – does not fall neatly under Rule 50(a). Nor is Rule 50(b) a clear fit. Although Defendants did not make an initial motion under Rule 50(a),

"manifest injustice" would result if their due process argument was not considered because those awards were unconstitutionally excessive, thereby violating Defendants' due process rights. Because any awards greater than the ones noted above would be unconstitutional, judgment will be entered in those amounts pursuant to Rule 50.[22]

## IV.  Conclusion

For the foregoing reasons, Plaintiffs' motion for equitable relief and for judgment as a matter of law will be denied, while Defendants' motion for remittitur or a new trial will be granted in part and denied in part.  Plaintiffs' motion for post-judgment discovery will be denied as moot.  A separate order will follow.

_/s/_
DEBORAH K. CHASANOW
United States District Judge

---

[22] Rule 50(c) provides that when the court grants a motion for judgment as a matter of law pursuant to Rule 50(b), it must also conditionally rule on any motion for a new trial "by determining whether a new trial should be granted if the judgment is later vacated or reversed."  Defendants' motion alternatively requested a new trial in relation to punitive damages if the court declined to enter judgment as a matter of law.  For the reasons explained in the analysis of the due process guideposts above, leaving the verdict in place would result in an injustice to Defendants.  Accordingly, Defendants' request for a new trial on the issue of punitive damages will be conditionally granted should the Fourth Circuit vacate or reverse the amended judgment and Plaintiffs refuse to accept remittitur.